1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11

12   UNITED STATES OF AMERICA,            No. 2:25-cr-135-WBS

13                  Plaintiff,

14        v.                              MEMORANDUM AND ORDER RE:
                                          DEFENDANT'S MOTION TO DISMISS
15   NICOLAS VASQUEZ, II,

16                  Defendant.

17

18                              ----oo0oo----

19        Defendant Nicolas Vasquez, II was indicted on May 29,

20   2025, and charged with unlawfully possessing ammunition in

21   violation of 18 U.S.C. § 922(G)(1).  (Docket No. 1.)  Because

22   Vasquez was found to qualify for appointment of counsel, at his

23   initial appearance on June 2, 2025, the Federal Defender was

24   appointed to represent him.  (Docket No 7.)  Later, on August 4,

25   2025, because Vasquez was dissatisfied with the representation

26   being afforded to him by the Federal Defender, the court referred

27   the matter for appointment of outside counsel to represent him.

28   (Docket No. 21.)  On August 6, 2025, the court ordered present

                                     1

counsel Danica Mazenko appointed to represent defendant pursuant
to the Criminal Justice Act (CJA), 18 U.S.C. § 3006A.  (Docket
No. 23.)

Vasquez, through his newly appointed attorney, has now
filed a motion to dismiss the charges against him with prejudice,
claiming a deprivation of his right to counsel as guaranteed by
the Sixth Amendment to Constitution.  U.S. Const. amend. VI; see
also Gideon v. Wainwright, 372 U.S. 335, 340 (1963).  (Docket No.
34.)  Vasquez argues that due to the ongoing lapse in federal
funding, "[t]he prolonged non-payment of appointed counsel
violates Defendant's Sixth Amendment rights and the fundamental
guarantee of Gideon v. Wainwright, warranting dismissal of the
indictment."  (Id. at 6.)

Vasquez alleges that funding for defense counsel
appointed under the CJA was depleted in July 2025 with the result
that his counsel "has been working without significant
compensation on CJA cases since June 2025."  (Docket No. 34 at
2.)  As a result of this delay in CJA reimbursements, he argues
that "an untenable conflict between counsel's professional
obligations and their basic economic survival" has been created
that "undermines the attorney-client relationship and compromises
the quality of representation guaranteed by the Sixth Amendment."
(Id. at 2-3.)

I.   There is no constitutional right to compensation for court-
     appointed counsel in these circumstances.

The Sixth Amendment does not require that court-
appointed counsel be compensated.  Gideon v. Wainwright, 372 U.S.
335 (1963), establishes that indigent defendants have a right to

court-appointed counsel, and Strickland v. Washington, 466 U.S. 668 (1984), mandates that defendants receive effective assistance of counsel.  However, there is nothing in the Constitution, and nothing in Gideon, Strickland, or their progeny, requiring that counsel receive compensation for representing an indigent criminal defendant.

To the contrary, numerous federal courts have repeatedly and explicitly held that court-appointed counsel do *not* have any constitutional right to compensation.  See Scheehle v. Justs. of Supreme Ct. of Ariz., 508 F.3d 887, 894-95 (9th Cir. 2007) ("The position that any imposition on an attorney's time must be compensated is foreclosed by our prior opinions." (cleaned up); see also United States v. Dillon, 346 F.2d 633 (9th Cir. 1965), cert. denied, 382 U.S. 978 (1966); United States v. 30.64 Acres of Land, 795 F.2d 796, 803 (9th Cir. 1986) ("If a court determines that a case has sufficient merit and a litigant sufficient need to justify uncompensated representation by counsel, we are confident that individual members of the bar will respect that decision and provide the needed services.") (citing Rhodes v. Houston, 258 F.Supp. 546, 579 (D.Neb. 1966) ("To the credit of the legal profession, it may be declared that such a *refusal* will rarely occur.") (emphasis in original), aff'd, 418 F.2d 1309 (8th Cir. 1969), cert. denied, 397 U.S. 1049 (1970)); Powell v. State of Alabama, 287 U.S. 45, 73 (1932) ("Attorneys are officers of the court, and are bound to render service when required by such an appointment."); Peterson v. Nadler, 452 F.2d 754, 758 (8th Cir. 1971); Fam. Div. Trial Laws. of Superior Ct.- D.C., Inc. v. Moultrie, 725 F.2d 695, 705 (D.C. Cir. 1984)

1    ("[T]here is no facial unconstitutionality to the statute or

2    rules that require appointments in uncompensated cases.").

3    (collecting cases).

4              In <u>United States v. Dillon</u>, the Ninth Circuit held that

5    there was "an obligation on the part of the legal profession to

6    represent indigents upon court order, without compensation." 346

7    F.2d 633, 635 (9th Cir. 1965), <u>cert. denied</u>, 382 U.S. 978 (1966).

8    There the court reasoned that:

9         An applicant for admission to practice law may justly
10        be deemed to be aware of the traditions of the
          profession which he is joining, and to know that one
11        of these traditions is that a lawyer is an officer of
          the court obligated to represent indigents for little
12        or no compensation upon court order. Thus, the lawyer
          has consented to, and assumed, this obligation and
13        when he is called upon to fulfill it, he cannot
          contend that it is a "taking of his services."
14

15   <u>Id.</u>; <u>cf.</u> <u>Kunhardt & Company, Inc. v. United States</u>, 266 U.S. 537

16   (1925).

17

18            Similarly, in <u>30.64 Acres of Land</u>, the Ninth Circuit
     observed that,
19
          Courts have long recognized that attorneys, because of
20        their profession, owe some duty to the court and to
          the public to serve without compensation when called
21        on. ... [T]he obligation of the legal profession to
          serve indigents on court order is an ancient and
22        established tradition, and ... appointed counsel have
          generally been compensated, if at all, only by
23        statutory fees which would be inadequate under just
          compensation principles, and which are usually payable
24        only in limited types of cases.
25

26   795 F.2d at 800-01.

27            The <u>Dillon</u> court further explained that decisions about
28

4

schemes providing for the compensation of court-appointed counsel
are the purview of legislatures, not courts:

> The problem of providing some system of compensation
> for appointed counsel, in light of the developing law
> of the right of indigents to counsel, is a matter for
> legislative and not judicial treatment.  This fact has
> been recognized by the Congress in the enactment of
> the Criminal Justice Act of 1964, 78 Stat. 552.  The
> provisions of the Act clearly show that the
> compensation provided for in said Act is not based
> upon the principles of just compensation which appear
> in the Fifth Amendment.

Dillon, 346 F.2d at 636; see Hurtado v. United States, 410 U.S.
578, 588-89 (1973) (citing Dillon); see also White v. United
States Pipe & Foundry Co., 646 F.2d 203, 205 n. 3 (5th Cir.
1981).

Indeed, "[a]ny doubt that a state could require some
services from an attorney without compensation was dissolved by
our opinion in 30.64 Acres of Land[.]" Scheehle, 508 F.3d at 894-
95.  That said, some courts have left room for the possibility
that an attorney's appointment without compensation may
constitute a violation of either the Fifth or Thirteenth
Amendments, but these exceptions are especially narrow.[1]

---

[1]    In Moultrie, the court opined that where a system for
the court-appointment of counsel without compensation
"effectively denies [counsel] the opportunity to maintain a
remunerative practice before their specialized division, and that
specialty practice is determined to be a 'property' interest, it
might effect an unconstitutional 'taking.'"  725 F.2d at 706
(cleaned up).
    Similarly, the Moultrie court also concluded that no
"genuine thirteenth amendment issue" was raised because "[a]n
attorney who wishes to take no further assignments is free to
either stop practicing before the Family Division, or even to
continue to practice without taking CJA-compensated juvenile
cases."  725 F.2d at 704-05.  According to that court, the key
ingredient for establishing a claim of involuntary servitude
under the Thirteenth Amendment is the "[i]nability to avoid

1    Exceptions which do not apply in this case

2  notwithstanding, on balance the precedent on this question is

3  resoundingly clear.  The position advanced by Vasquez is not

4  merely novel, it runs contrary to the *overwhelming* weight of

5  well-established precedent.

6  II.  Vasquez's counsel has not been denied compensation

7    The foregoing discussion is unnecessary, however,

8  because even if Vasquez were constitutionally entitled to counsel

9  who was compensated by the court, his attorney has not been

10  denied compensation.  CJA-appointed counsels' compensation has

11  only delayed, not denied, by the lack of funding, and at this

12  stage in his case Vasquez's counsel is not entitled to receive

13  any compensation.

14    First, CJA-appointed counsel have not been denied

15  compensation due to the government shutdown.  Rather, their

16  compensation has merely been deferred or delayed until such time

17  as Congress funds the government.

18    The United States Courts Defender Services has

19  explained that:

20    Fiscal Year 2025 Criminal Justice Act (CJA) panel
   attorney funds were depleted around July 3, 2025.
21    Panel attorney payments have been deferred (except for
   one batch of payments on September 18) since that
22    date.  The deferred payments from fiscal year 2025,
   and new fiscal year 2026 panel attorney payments,
23    continue to be deferred during the current lapse in
   appropriations.  *Panel attorney payments will resume*
24    *when a continuing resolution is passed by Congress and*

25

26  continued service[.]"  Id.  (citing see Flood v. Kuhn, 443 F.2d
   264 (2d Cir. 1971), aff'g 316 F.Supp. 271 (S.D.N.Y. 1970), aff'd
27  on other grounds, 407 U.S. 258 (1972); Wicks v. Southern Pacific
   Co., 231 F.2d 130, 138 (9th Cir. 1956), cert. denied, 351 U.S.
28  946 (1956)).

*signed into law by the President.* Please continue to file, process, and approve CJA vouchers as normal during the payment deferrals so that payments can be disbursed as soon as funding becomes available.

UNITED STATES COURTS: DEFENDER SERVICES, CJA Panel Attorney Funds Information FY 2025 (updated: Oct. 6, 2025), https://www.uscourts.gov/about-federal-courts/defender-services/cja-panel-attorney-funds-information-fy-2025 (last visited Oct. 17, 2025) (emphasis added).

Once Congress funds the government, CJA-appointed counsel will be entitled to receive their reimbursements including back-pay. Contrary to Vasquez's claims, then, the government has not refused "to honor its compensation obligations." (Docket No. 34 at 4.) More accurately, the government has deferred the honoring of those obligations. These actions are not the same and Vasquez errs by conflating them.

Second, the government correctly notes that CJA-appointed counsel do *not* receive a salary for representing defendants in federal court. Rather, they submit vouchers requesting reimbursement following the conclusion of their representation. It is the court, not the government, that determines whether, how much, and when the attorney shall be paid. See United States v. Feldman, 788 F.2d 625, 626 (9th Cir. 1986). If waiting to be compensated until the conclusion of representation would pose a hardship on counsel, in exceptional cases the court in its discretion can approve vouchers for interim payments, but there is no suggestion that this is such a case.

Here, counsel for Vasquez was appointed on August 5,

2025.  (Docket No. 34 at 1.)  Since taking the case, Vasquez's counsel has received discovery from the government (Docket No. 26 at ¶ 3(a-b)) and jointly moved to continue the status conference until October 20, 2025 (Id. at ¶ 2), and no trial date has been set.  In other words, rather than having concluded, the case against Vasquez is ongoing, and counsel's representation is just beginning.  Further, counsel has not identified any costs which have been incurred in the course of representation and are ready to be submitted for payment.

III. The record does not support a finding of an actual conflict of interest that violates Vasquez's Sixth Amendment rights

"Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981) (citing Cuyler v. Sullivan, 446 U.S. 335 (1980)); see also Holloway v. Arkansas, 435 U.S. 475, 481 (1978).  However, "in order to obtain a dismissal of the indictment," a defendant bears the burden of establishing that he is adversely affected by his representation such that his Sixth Amendment right to counsel has been violated.  United States v. Kriens, 270 F.3d 597, 603 (8th Cir. 2001); see also United States v. Solomon, 679 F.2d 1246, 1250 (8th Cir. 1982).

Importantly, when a defendant alleges that he was adversely affected by his counsel's conflict of interest, "the constitutional predicate for his claim" is not satisfied "until [he] shows that his counsel *actively represented conflicting interests*[.]" Cuyler, 446 U.S. at 350 (citation omitted) (emphasis added).  Said another way, "[i]n order to demonstrate a

1    violation of his Sixth Amendment rights, a defendant must

2    establish that an actual conflict of interest adversely affected

3    his lawyer's performance." Id.

4        Here, that burden has not been met.  Vasquez argues

5    that the delayed compensation for his CJA-appointed counsel

6    creates a conflict between "counsel's duty to zealously represent

7    [Vasquez] and counsel's need for economic survival" that

8    "undermines the attorney-client relationship and compromises the

9    quality of representation guaranteed by the Sixth Amendment."

10   (Docket No. 34 at 3.)  Vasquez has shown neither that any actual

11   conflict of interest exists, or that his counsel is actively

12   representing that conflicting interest.

13       First, Vasquez's counsel accepted his case on August 5,

14   2025, which was by her own admission at least a month after CJA-

15   appointed counsel were last reimbursed.  (Id. at 2 ("Funding ran

16   out in July 2025, and as a result the undersigned has been

17   working without significant compensation on CJA cases since June

18   2025.").)  Vasquez's argument for a conflict of interest might be

19   more persuasive had his counsel not accepted appointment *after*

20   she was on notice that funding for CJA-appointed counsel had

21   *already been exhausted*.  To date, Vasquez's counsel has not filed

22   a motion to withdraw, as would be proper in the event of a

23   *genuine* conflict of interest.

24       This record suggests either that no actual conflict

25   exists or that it is only theoretical.  See Bonin v. Calderon, 59

26   F.3d 815, 827 (9th Cir. 1995) ("[M]inor or potential conflicts of

27   interest often exist which might theoretically or conceivably

28   affect an attorney's representation, but are not likely to do so.

1    Such 'potential' conflicts are insufficient[.]").

2         Second, even if there were an actual conflict of

3    interest due to the deferred compensation, Vasquez has not

4    established that his counsel is actively representing that

5    conflicting interest.  See Atkins v. Bean, 122 F.4th 760, 786–87

6    (9th Cir. 2024) (finding no actual conflict where defendant

7    "failed to show any deficient performance by counsel or resulting

8    prejudice."), cert. denied, No. 24-7302, 2025 WL 2906511 (U.S.

9    Oct. 14, 2025).

10        Counsel's own argument affirms that she has diligently

11   sought to fulfill her professional and ethical duties.  "[T]here

12   is a 'presumption that the lawyer will subordinate his pecuniary

13   interests and honor his primary professional responsibility to

14   his clients in the matter at hand.'" United States v. Walter-Eze,

15   869 F.3d 891, 902 (9th Cir. 2017) (citation omitted).  According

16   to Vasquez's motion, "[d]espite the lack of compensation," his

17   counsel has "continued to represent the Defendant to prevent

18   immediate prejudice[.]"  (Docket No. 34 at 2.)  Indeed, her

19   actions filing this very motion — one which advances a novel

20   legal argument — strongly suggest that she continues to zealously

21   represent her client's interests.

22        Counsel's contention that due to the lapse in funding,

23   Vasquez cannot access a psychologist in order to evaluate whether

24   he is competent to stand trial is premature at best.  Ordinarily,

25   CJA-appointed counsel would first submit a request to retain an

26   expert.  The court would then have to approve the request and,

27   eventually, authorize payment for their services at the

28

conclusion of the expert's services.[2]  But because no such request has been presented here, the court has not had the opportunity to consider much less approve it.  Consequently, the dilemma counsel claims to face is merely hypothetical at this stage and no actual conflicting interest exists for counsel to represent in violation of the Sixth Amendment.

The court is, thus, not persuaded either that Vasquez's counsel is actively representing a conflicting interest or that her delayed compensation constitutes an actual conflict of interest in the first place.

IV.  Ake v. Oklahoma

Vasquez argues that "the right to counsel is meaningless without adequate resources to mount an effective defense."  (Docket No 34 at 3 (citing Ake v. Oklahoma, 470 U.S. 68, 77 (1985)).)  While as a general proposition that is true, it does not apply to this case for the following reasons:

---

[2]    In his reply brief, defendant states that "CJA attorneys in the Eastern District of California no longer have any psychologists to call upon for CJA cases, at least until the budget crisis is resolved."  He adds that psychologists and other experts will accept CJA cases only if appointed counsel advance their personal funds to cover the expected fees.  (Docket No. 37 at 3.)  At oral argument, defense counsel stated she had attempted to retain one psychologist who was unavailable, and that she had spoken with 20 other CJA attorneys who told her there were no experts who would accept appointment.  Since this is the first time the court has heard any of these hearsay allegations, the government has not had an adequate opportunity to respond to them, nor has the court had an opportunity to explore, through the Federal Defender, whether there are psychologists available to accept the appointment.  After all, it is not as if they would not be paid.  They would only have to wait for payment until after the shutdown, and they would have to wait until after their services have been performed anyway.  It is hard to believe that there is no qualified psychologist who would accept appointment on these terms.

1    In Ake, the Supreme Court "focused on identifying the
2    'basic tools of an adequate defense or appeal,'" and "required
3    that such tools be provided to those defendants who cannot afford
4    to pay for them." Ake, 470 U.S. at 77 (citing Britt v. North
5    Carolina, 404 U.S. 226, 227 (1971)).  The specific "tool" at
6    issue in Ake was an expert evaluation by a psychiatrist in
7    support of an insanity defense.  Id. at 72; see also id. at 70
8    ("The issue in this case is whether the Constitution requires
9    that an indigent defendant have access to the psychiatric
10    examination and assistance necessary to prepare an effective
11    defense based on his mental condition, when his sanity at the
12    time of the offense is seriously in question.").

13    In his motion, Vasquez failed to specify any "basic
14    tools" he is being denied as a result of delayed compensation for
15    his CJA-appointed counsel.  Now, for the first time, in Vasquez's
16    reply to the government's opposition to the motion, his attorney
17    indicates that the real problem is that she is unable to explain
18    the procedure for requesting a bail review to Vasquez and that he
19    is immovable in his believe that he is entitled to pretrial
20    release.  As a result, she feels a psychological evaluation of
21    the defendant is a basic resource she needs in order to provide
22    effective representation.  However, she says that "most CJA
23    providers and experts ceased accepting appointments to new cases
24    in July and August of 2025."  (Docket No. 37 at 3.)  She adds
25    that "BOP facility forensic psychologists are currently
26    furloughed.

27    These facts might justify a court session at which the
28    mechanics of pretrial release and bail review are further

explained to Vasquez.  They might also justify enlisting the
assistance of the Federal Defender's office in finding a
qualified expert who is willing to consult with counsel and/or
examine the defendant.  But other than making passing mention of
these options in her reply brief, counsel has made no request for
any of them, and dismissal of the indictment is certainly not
justified on the basis of this record.

More generally, Vasquez's reliance on <u>Ake</u> is misplaced
as the case is properly distinguished because scope of the
Court's holding in <u>Ake</u> was limited due to the facts of that case,
most especially that it was a capital case: "Nothing in the
Court's opinion reaches non-capital cases." <u>Ake</u>, 470 U.S. at 87
(Burger, C.J., concurring) ("The facts of the case and the
question presented confine the actual holding of the Court.  In
capital cases the finality of the sentence imposed warrants
protections that may or may not be required in other cases.")).
Here, Vasquez has not been charged with a capital offense.  (<u>See
generally</u> Docket No. 1.)

Further, Vasquez asserts that the "fundamental fairness
and equal protection principles inherent in the adversarial
system" has been violated because the prosecutors are being
compensated while defense counsel are not.  (<u>Id.</u> at 3.)  But with
there being no action in this case other than a continuance of
the status conference while Vasquez's counsel caught herself up
with the case to date, Vasquez has not pointed to any
prosecutorial activities on the part of the government (other
than providing Vasquez with discovery) that prejudiced him.

Nor has Vasquez shown how he even *could* be prejudiced

by the government temporarily continuing to prosecute its case against him given that CJA-appointed counsel, not being salaried, are typically only entitled to reimbursement *after* the conclusion of their representation. Moreover, even if the Court agreed with Vasquez's on this point, his claim would have been mooted when funding lapsed on October 1, 2025. Since that date, counsel for the government has been operating under the same reimbursement conditions as CJA-appointed counsel. (Docket No. 36 at 6 n. 6.)

V.    State v. Peart

        Vasquez argues that "[a]t least one court has recognized that dismissal may be warranted when systemic underfunding of defense counsel violates constitutional rights." (Docket No. 34 at 4.) Indeed, Vasquez identifies *only* one case: State v. Peart, 621 So. 2d 780 (La. 1993). Setting aside the fact that Peart is not a not a federal court decision, but a Louisiana Supreme Court case arising from a state court proceeding, the facts of Peart clearly distinguish it from the facts of this case.

        In Peart, the trial court found that Teissier, the defender in question, "was not able to provide his clients with reasonably effective assistance of counsel because of the conditions affecting his work, primarily the large number of cases assigned to him." 621 So. 2d at 784. The trial court found that,

> At the time of his appointment, Teissier was handling 70 active felony cases. His clients are routinely incarcerated 30 to 70 days before he meets with them. In the period between January 1 and August 1, 1991, Teissier represented 418 defendants. Of these, he entered 130 guilty pleas at arraignment. He had at

14

least one serious case set for trial for every trial
date during that period. OIDP has only enough funds
to hire three investigators. They are responsible for
rendering assistance in more than 7,000 cases per year
in the ten sections of Criminal District Court, plus
cases in Juvenile Court, Traffic Court, and
Magistrates' Court. In a routine case Teissier
receives no investigative support at all. There are
no funds for expert witnesses. OIDP's library is
inadequate.

Id.

Ultimately, the trial court found that the system of
compensation for counsel representing indigent defendants "was
unconstitutional as applied in the City of New Orleans because it
[did] not provide adequate funding for indigent defense and
because it place[d] the burden of funding indigent defense on the
city of New Orleans." Id. On appeal, the Louisiana Supreme Court
overturned the trial court's rulings as to the statutory scheme
for funding counsel for indigent defendants and remanded the case
back to the trial court for further proceedings. Id. at 792. In
particular, on remand the Louisiana high court also found that
Peart and other indigent defendants similarly situated may have
been deprived of effective assistance of counsel and so
instructed the trial court to hold such hearings as necessary to
ensure defendants' rights were not violated. Id.

Nothing like the facts in Peart can be found from the
record in this case. While a state court in one case found that
dismissal may be appropriate on a case-by-case basis where
indigent defendants are represented by a wholly under resourced
representation funding scheme, the extreme factual context of
Peart make it entirely inapplicable to this case.

15

1

2    VI.  Vasquez's proposed alternative remedies

3             As alternatives to dismissal of the indictment with

4    prejudice, Vasquez suggests several lesser remedies, which are

5    either unnecessary, inadequate or excessive.  Releasing him on

6    his own recognizance fails to either rectify the prejudice or

7    mitigate the conditions giving rise to it and would ignore the

8    Pretrial Services officer's determination that Vasquez poses both

9    a flight risk and an ongoing danger to the public.  (See Docket

10   No. 30 at 4.)  Issuing an "[o]rder requiring immediate payment of

11   all outstanding fees in all CJA cases".  (Id.), is untenable

12   because it is inappropriately broad and would require the court

13   to exercise authority that it does not have – namely, to order

14   the federal government to issue payment of funds not yet

15   appropriated by Congress.

16            The suggestion that this court should dismiss the

17   Indictment in this federal case in favor of prosecution by the

18   local prosecutor in state court runs afoul of both the concept of

19   federalism and the separation of powers.  The Ninth Circuit has

20   cautioned that charging decisions are within the prosecutors',

21   and not the courts', domain.  See United States v. Miller, 722

22   F.2d 562, 565 (9th Cir. 1983).  It is within the exclusive

23   province of the United States Attorney to determine what charges

24   are to be brought and where.

25   VII. Conclusion

26            This motion is just one of a number of similar motions

27   filed in cases pending in this and other districts seeking to

28

                                    16

1  dismiss indictments because of the lack of funds to pay the fees
2  and costs of defense incurred by court-appointed counsel.
3  Counsels' characterization of this situation as unprecedented is
4  more than just a little misleading.  It has been only 32 days
5  since the last batch of CJA payments was issued and 20 days since
6  Congress failed to make appropriations to fund government
7  operations.  While the current lapse in funding may be longer
8  than previous ones, it is certainly not the first.

9         To put this in historical perspective, during the more
10 than 19 months between the Supreme Court's decision in Gideon and
11 the enactment of the CJA, the courts were required to appoint
12 counsel for indigent defendants, although Congress had not
13 appropriated funds to compensate attorneys to represent such
14 defendants, and there were no paid federal defenders.  The
15 courts' solution for that crisis was not to summarily dismiss the
16 indictments in all pending cases against indigent defendants, nor
17 to preclude the government from bringing such cases, or even to
18 stay the proceedings.  Instead, the lawyers of this community
19 answered the call by willingly undertaking representation of
20 those indigent defendants pro bono.

21        Subsequently, since the implementation of the
22 Congressional Budget and Impoundment Control Act of 1974, there
23 have been 20 federal government shutdowns due to a lapse in
24 funding, excluding the current shutdown.  See CONG. RESEARCH SERV.,
25 RL34680, *Shutdown of the Federal Government: Causes, Processes,*
26 *and Effects* 6 tbl.1 (2019),
27 https://sgp.fas.org/crs/misc/RL34680.pdf.  Throughout this 48-
28 year history, *no* federal court to this court' knowledge has found

17

1    that the delayed reimbursement of CJA-appointed defense counsel

2    constituted a violation of a defendant's Sixth Amendment right to

3    counsel.

4            "[T]he power to dismiss an indictment is 'reserved ...

5    for extremely limited circumstances.' Whitehouse v. United States

6    District Court, 53 F.3d 1349, 1360 (1st Cir. 1995) (citing Bank

7    of Nova Scotia v. United States, 487 U.S. 250, 263 (1988))."

8    United States v. Lin, No. 22-CR-10279-AK-11, 2025 WL 641371, at

9    *3 (D. Mass. Feb. 27, 2025).  As such, "[d]ismissal of an

10   indictment is not to be lightly granted." United States v. Soc'y

11   of Indep. Gasoline Marketers, No. B-76-0314, 1977 WL 1508, at *2

12   (D. Md. Feb. 24, 1977).[3]  For the reasons discussed above, the

13   court finds that Vasquez has failed to show the exceptional

14   circumstances necessary to justify departure from this long-

15   standing precedent counselling against dismissal.

16           IT IS THEREFORE ORDERED that defendant's Motion to

17   Dismiss (Docket No. 34) be, and the same hereby is, DENIED.

18   Dated:  October 20, 2025

19                              WILLIAM B. SHUBB
                                UNITED STATES DISTRICT JUDGE

20

21

22

23

24       [3]    See also United States v. Filer, 762 F. Supp. 3d 730,
     746 (N.D. Ill. 2025), appeal dismissed, No. 25-1079, 2025 WL
25   1952087 (7th Cir. Jan. 19, 2025) (citations omitted) (holding
     that "Federal courts are advised to exhibit a modicum of
26   restraint when considering whether to dismiss an indictment
     because a dismissal encroaches not only upon the fundamental role
27   of the grand jury, but also upon the role of the prosecutor.")
     (citation omitted)).
28

                                   18